IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CERESA COHRAN, an individual, | ) |
| | ) Case No.: 1:24-cv-11917 |
| Plaintiff, | ) |
| v. | ) Judge: Hon. LaShonda A. Hunt |
| | ) |
| UBER TECHNOLOGIES, INC., a foreign corporation; | ) Magistrate Judge: Hon. Judge |
| LYFT, INC., a foreign corporation; CITY OF CHICAGO, | ) Jeannice W. Appenteng |
| a municipal corporation; | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND
TEMPORARY RESTRAINING ORDER**

NOW COMES the Plaintiff, CERESA COHRAN, by and through her attorneys, in opposition to Defendant City of Chicago's Motion to Dismiss under Rule 12(b)(6), and states as follows:

**INTRODUCTION**

Defendant City of Chicago ("the City") seeks dismissal of Plaintiff's claims under the Fourteenth Amendment's Due Process and Equal Protection Clauses, as well as her state law claim for tortious interference. However, Plaintiff has sufficiently pleaded that the City's enforcement of Rule TNP 1.10 has directly deprived her of her constitutionally protected rights and business opportunities without due process, thereby warranting denial of the City's motion.

**STANDARD OF REVIEW**

When ruling on a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6), the court must consider all the alleged facts in the complaint as true, draw all reasonable inferences in plaintiff's favor, and ask "whether there is any possible interpretation of the complaint under which it can state a claim." *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 640 (7thCir.2004). The Complaint need not contain "[d]etailed factual allegations," but "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

1

its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.544, 570 (2007)). A claim must stand when its factual content allows the court to draw a reasonable inference that the defendants are liable for the misconduct alleged. *Id*.

### ARGUMENT

I. **Plaintiff Has Properly Stated a Due Process Claim Under the Fourteenth Amendment.**

The City argues that Plaintiff's due process claim fails because (1) no City policy caused her injury, and (2) she lacks a protected property or liberty interest. Neither argument holds.

### A. The TNP Ordinance is the Moving Force Behind Plaintiff's Injury.

Plaintiff's injury stems directly from the enforcement of Rule TNP 1.10, which mandates that rideshare companies notify the City upon deactivating a driver for a public safety concern. DKT #1, ¶¶ 11–13, 34. This regulation effectively serves as a blacklist that forecloses economic opportunities for affected drivers. The City's role in enforcing this rule and disseminating information regarding any alleged "public safety concern" makes it a moving force behind Plaintiff's injury. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (municipal liability attaches where a policy or custom is the "moving force" behind a constitutional violation).

The Fourteenth Amendment mandates that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV. A state usually need not protect its citizens from "private actors," *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *cf. Nabozny v. Podlesny,* 92 F.3d 446, 459 n. 13 (7th Cir.1996) (outlining factors indicating a custodial relationship in which states have an affirmative duty to protect from private actors), but it may not violate due process via one of its own actors. *Collins v. City of Harker Heights*, 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *DeShaney*, 489 U.S. at 195, 109 S.Ct. 998; *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 723–24 (3d Cir.1989).

A municipality, such as the City of Chicago, may be liable for a section § 1983 violation if, among other things: (1) it has a permanent and well-settled municipal custom or practice that, although not authorized by official law or policy, was the moving force behind the plaintiff's constitutional injury; or (2) an individual with final policy-making authority for the municipality (on the subject in question) caused the constitutional deprivation. *Monell v. City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir.2002). To establish an official policy or custom, a plaintiff must show that his constitutional injury was caused "by (1) the enforcement of an express policy of the [village], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Latuszkin v. City of Chicago,* 250 F.3d 502, 504 (7th Cir.2001) (citing *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir.2000)).

Rule TNP 1.10(b): Requires TNPs to notify the City of Chicago when a driver has been deactivated for a "public safety concern." The City is responsible for collecting, maintaining, and disseminating this list to other TNPs. The City's active role in maintaining and distributing this information to other companies increases the likelihood of industry-wide blacklisting, effectively ensuring that a deactivated driver is barred from working across all rideshare platforms. This system coerces or pressures other TNPs into deactivation by creating an assumption that any deactivated driver is a safety risk.

However, Rule TNP 5.13 regarding the "Revocation of a TNP Chauffeur License" states that the "Grounds for revocation of a TNP chauffeur license includes: "**Conviction** of any criminal offense involving a felony arising in connection with the provision of transportation network provider services or any crime against a passenger while performing TNP services," Rule TNP 5.13(a)(3) (emphasis added). In that case, <u>"If any of the above grounds exist, the BACP Commissioner shall institute an action with the Department of Administrative Hearings. If, after</u>

3

<u>the hearing, the administrative law officer determines that a violation has occurred, the administrative law officer shall enter an order revoking or suspending the TNP chauffeur license and/or imposing a fine</u>." Rule TNP 5.13(b) (emphasis added).

Conversely, Rule TNP 5.02 states that "Deactivation from a licensed TNP platform **immediately suspends** the transportation network driver's TNP chauffeur license." Rule TNP 5.02 (emphasis added). Even though the City argues that Uber and Lyft made independent business decisions, this rule expressly mandates the automatic suspension of Plaintiff's ability to work in the industry. By making deactivation synonymous with a license suspension, the City directly contributes to the injury by stripping Plaintiff of her ability to earn a living.

Here, Rule TNP 5.13 outlines the process for the City to revoke a TNP chauffeur license but requires notice and a hearing—and only where a driver is "**convicted**" of a "crime against a passenger while performing TNP services." This is directly in contravention of Rule TNP 5.02 which allows for the immediate suspension of the driver's TNP chauffeur license on mere allegations of a crime against a passenger without notice and a hearing. There is no equivalent due process requirement in Rule TNP 1.10 and Rule TNP 5.13 before a driver is placed on the deactivation list. The City created a procedural loophole where it allows TNPs to deactivate drivers without a hearing but still enforces the economic consequences of that deactivation through license suspension. This constructively revokes Plaintiff's ability to work without a fair opportunity to challenge the claims against her.

In their Motion, the City cites *Blum v. Yaretsky*, 457 U.S. 991 (1982) which states that:

> "although the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment."

*Blum*, 457 U.S. 991 at 1004–1005.

4

First of all, *Blum* states that "the factual setting of each case will be significant," and in this case, the facts of *Blum* are easily distinguishable from the facts in the present case. In *Blum*, the Respondent, Yaretsky was a Medicaid recipient who was transferred from a nursing home to a lower level of care in a health related facility after case review by the nursing home's utilization review committee. *Blum*, 457 U.S. 991. The decision was based on independent medical judgment made by private parties. Id. The fact that the state responded by adjusting the benefits did not make the state responsible for the decision to transfer the patient. Id. There was no indication that these decisions were influenced by the state's obligations to adjust payment accordingly. Id. However, in *Blum,* the U.S. Supreme Court also held that the "complaining party must also show that there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself," and that the required nexus may be present if the private entity has exercised powers that are "traditionally the exclusive prerogative of the State." *Blum*, 457 U.S. 991 at 1004–1005.

Here, the City freely permits Uber and Lyft to deactivate its drivers from their platforms, which **immediately suspends** the transportation network driver's TNP license. Rule TNP 5.02. This rule negates the need for the City to follow its own Rule TNP 5.13, which outlines the process for the City to revoke a TNP license and requires notice and a hearing. Rule TNP 5.13. The power to revoke a TNP license should be the power of the City alone, yet it allows the TNPs like Uber and Lyft to exercise powers that are "traditionally the exclusive prerogative of the State." As such, the City is responsible and the actions of Uber and Lyft are converted to state action. Accordingly, the Motion to Dismiss must be denied.

    B.  **Plaintiff Has a Protected Property and Liberty Interest.**

The right to earn a living is a recognized liberty interest protected by the Fourteenth Amendment. See *Greene v. McElroy*, 360 U.S. 474, 492 (1959).

5

      i. **Procedural Due Process.**

To state a Fourteenth Amendment claim for the deprivation of a property interest without due process, a plaintiff must demonstrate that (1) he had a constitutionally protected property interest, (2) he suffered a loss of that interest amounting to a deprivation, and (3) the deprivation occurred without due process of law. *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 944-945 (7th Cir. 2010); *Moss v. Martin*, 473 F.3d 694 (7th Cir.2007). The City argues that Plaintiff "has no constitutionally protected interest in an independent contractor relationship with Uber or Lyft." DKT #32-1, p. 6. That may or may not be true, but Plaintiff has a property interest in the Transportation Network Provider (TNP) license issued by the City, which carries due process protection under Chicago law. The City does not make any arguments disputing that. The plaintiff has also sufficiently alleged that the City's enforcement of Rule TNP 1.10 effectively bars her from working as a rideshare driver without procedural safeguards, which caused her to suffer a loss amounting to a deprivation. *See* arguments *supra.*

"[G]overnmental agencies are restrained by the Constitution from acting arbitrarily with respect to employment opportunities that they either offer or **control**." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 588 (1972) (emphasis added). "[T]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Id.*, citing (*Truax v. Raich*, 239 U. S. 33, 239 U. S. 1 (1915); *Meyer v. Nebraska*, 262 U. S. 390, 262 U. S. 399 (1923)). Where "important interests" of the citizen are implicated, they are not to be denied or taken away without due process. *Board of Regents of State Colleges*, 408 U.S. 564, 584.

> "Certain attributes of "property" interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to

provide an opportunity for a person to vindicate those claims. Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

*Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

Occupational licenses, once granted, are considered such entitlements. *See Barry v. Barchi,* 443 U.S. 55 (1979) (horse trainer's license was a property right protected under the Due Process Clause). A governmental entity cannot exclude a person from any "occupation in a manner or for reasons that contravene the Due Process Clause of the Fourteenth Amendment." *Schware v. Board of Bar Examiners*, 353 U.S. 232, 232 (1957). When a governmental entity controls the qualifications to practice an occupation, "it is not a matter of the [governmental entity's] grace, and a person cannot be barred except for valid reasons." *Id*.

The case of *Reed v. Village of Shorewood*, 704 F.2d 943 (7th Cir. 1983) analyzes the issue in depth, in the context of liquor licenses as property interests in Illinois. In that case, the Seventh Circuit stated:

> "Since, viewed functionally, property is what is securely and durably yours under state […] law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain, we must ask whether under Illinois law a liquor license is securely and durably the licensee's. The license is good for one year and during that time, clearly, it is securely held, for it can be revoked only for cause, after notice and hearing, and subject to judicial review. See Ill.Rev.Stat. 1981, ch. 43, ¶¶ 149, 153. These are the same conditions under which a teacher's tenure, a form of property under the Fourteenth Amendment, can be revoked.

*Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983).

The Seventh Circuit continued:

> "We must consider next whether the defendants could be found to have deprived the plaintiffs of their property rights. The defendants never succeeded in taking away the plaintiffs' license either by revocation or nonrenewal; their efforts to do so were thwarted by the Illinois Liquor Control Commission; and though the brief suspensions were deprivations, *see North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 606, 95 S.Ct. 719, 722, 42 L.Ed.2d 751 (1975), they were not denials of due process. But 'deprive' in the due process clause cannot just mean 'destroy.'

7

> If the state prevents you from entering your house it deprives you of your property right even if the fee simple remains securely yours. A property right is not bare title, but the right of exclusive use and enjoyment. So, if it is true as alleged that through harassment of customers and employees and relentless, baseless prosecutions the defendants destroyed the value of the plaintiffs' licensed business and forced them ultimately to give up their Class A license, the plaintiffs were deprived of their property right in the license even though the license was never actually revoked."

*Reed v. Village of Shorewood*, 704 F.2d 943, 949 (7th Cir. 1983)

Here, the City controlled the licensing of TNP drivers in Chicago. See RULE TNP1.01. The license is subject to terms and conditions and is valid for a one (1) period, to be renewed annually. See RULE TNP1.02. Even though the City itself never revoked Plaintiff's TNP license, it allowed baseless allegations by Uber to form the basis of the immediate suspension of her TNP license without a hearing pursuant to Rule TNP 5.13. Thus, Plaintiff had a constitutionally protected property interest, and she suffered a loss of that interest amounting to a deprivation, based on the City's actions, which occurred without due process of law. Accordingly, the Motion to Dismiss must be denied.

  **ii. Substantive Due Process.**

Substantive due process challenges involving only the deprivation of a property interest are cognizable where the plaintiff shows "either the inadequacy of state law remedies or an independent constitutional violation." *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir.2003). "Substantive" due process "is the idea that depriving a person of life, liberty, or property can violate the due process clause of the Fifth and Fourteenth Amendments even if there are no procedural irregularities — even if, for example, the state after due deliberation has passed a statute establishing procedures for taking private homes and giving them to major campaign contributors or people with red hair, and in taking the plaintiff's home has complied scrupulously with the statute's procedural requirements." *Coniston Corp. v. Village of Hoffman Estates,* 844 F. 2d 461, 465 (7th Cir. 1988). "[I]n order to prevail on a substantive due process

8

claim, plaintiffs must allege and prove that the denial of their proposal is arbitrary and unreasonable bearing no substantial relationship to the public health, safety or welfare," *Coniston*, at 467. Here, Plaintiff concedes that a driver convicted of criminal activity, sexual misconduct, and driving under the influence certainly relates to public health, safety or welfare. However, where the City allowing drivers to have their licenses be suspended and revoked for "Conduct that gave rise to a public safety concern not itemized above in this section," is too generic and ambiguous. As such, mere accusations of an a "public safety concern" without more is arbitrary and unreasonable. Accordingly, the Motion to Dismiss must be denied.

## II. Plaintiff Has Properly Stated an Equal Protection Claim.

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall […] deny to any persons within its jurisdiction the equal protection of laws." U.S. CONST. amend. XIV, § 1. Traditionally, the Equal Protection Clause is understood as protecting members of vulnerable groups from unequal treatment attributable to the state. *See Bell v. Duperrault,* 367 F.3d 703, 707 (7th Cir.2004). But it also proscribes state action that irrationally singles out and targets an individual for discriminatory treatment as a so-called "class-of-one." *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

All equal protection claims, regardless of the size of the disadvantaged class, are based on the principle that, under "like circumstances and conditions," people must be treated alike, unless there is a rational reason for treating them differently. *See Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601-02, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (quoting *Hayes v. Missouri,* 120 U.S. 68, 71-72, 7 942*942 S.Ct. 350, 30 L.Ed. 578 (1887)). Thus, a plaintiff states a class-of-one equal protection claim by alleging that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564, 120 S.Ct. 1073.

To be considered "similarly situated," a plaintiff and his comparators (those alleged to have been treated more favorably) must be identical or directly comparable in all material respects. Reget, 595 F.3d at 695. The "similarly situated" analysis is not a "precise formula," but the Seventh Circuit has stated repeatedly that what is "clear [is] that similarly situated individuals must be very similar indeed." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir.2004). Whether a comparator is similarly situated is a question for the fact-finder. *Id*.

The City argues that TNP drivers and taxi drivers are not similarly situated. However, both categories of drivers provide very similar services and are subject to City regulation. Plaintiff has sufficiently alleged that the City's rule imposes harsher, arbitrary restrictions on TNP drivers, lacking a rational basis. Courts have struck down economic regulations lacking justification. See *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). Thus, Plaintiff has plead a plausible equal protection violation. Accordingly, the Motion to Dismiss must be denied.

### III.     Plaintiff Has Properly Stated a Claim for Tortious Interference.

The City argues that it is immune from liability under the Illinois Tort Immunity Act. However, immunity does not extend to willful and wanton misconduct, and Plaintiff has alleged that the City knowingly enforced Rule TNP 1.10 to interfere with her ability to work. See *745 ILCS 10/2-202*. Furthermore, the City's act of transmitting unverified and damaging information to Lyft constitutes improper interference.

#### A. Plaintiff sufficiently pleads her Tortious Interference Claim.

To prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must prove: (1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *Fellhauer v. City*

10

*of Geneva,* 568 NE 2d 870, 878 (1991); *Schott v. Glover* (1982), 109 Ill.App.3d 230, 235, 64 Ill.Dec. 824, 440 N.E.2d 376; *Tru-Link Fence Co. v. Reuben H. Donnelley Corp*. (1982), 104 Ill. App.3d 745, 751, 60 Ill.Dec. 289, 432 N.E.2d 1188. Illinois courts have long recognized a legitimate expectancy in an employment relationship. *See London Guarantee & Accident Co. v. Horn* (1903), 206 Ill. 493, 507, 69 N.E. 526. ("[W]here the contract is one of employment, it is immaterial whether it is for a fixed period or is one which is terminable by either party at will, both parties being willing and desiring to continue the employment under that contract for an indefinite period"). It is well established that one who intentionally and without justification induces another to breach his contract with a third party will be liable to the other for the pecuniary loss resulting from the failure of the third person to perform the contract. *See* Restatement (Second) of Torts § 766 (1979).

The case of *City of Rock Falls v. Chicago Title & Trust Co.,* 13 Ill. App.3d 359, 300 N.E.2d 331 (3d Dist. 1973) is instructive. In that case, the City of Rock Falls brought an action seeking authorization to demolish a building alleged to be dangerous and unsafe. The beneficial owner of the building counterclaimed against the city and its mayor, alleging that the mayor tortiously interfered with the owner's use of his property. The trial court dismissed the owner's counterclaim. The appellate court, however, held that the allegations in the owner's counterclaim of refusals to issue applications for various licenses, misstatements to prospective lessees concerning the availability of the property, threats concerning utilities, and other patent abuses of public office stated a cause of action for tortious interference.

The Court in *City of Rock Falls* held that "[t]he tort action for interference developed at an early date to give recognition to the principle that a person's business is property which is entitled to protection from harm by another who is not acting in the exercise of some right such as the right to compete for business." *Id.,* at 362. Furthermore, the Court held that "[t]he defendants are not protected, we believe, by Sections 2-104 and 2-206 of the Local

11

Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1971, ch. 85 secs. 2-104, 2-206), which deal with the denial of permits and licenses by persons who are authorized to determine whether they should be issued or denied. These sections do not cover the refusal of applications, nor the bulk of the other misconduct alleged." *Id.*, at 363-364.

    Here, Plaintiff had a reasonable expectation of entering into a valid business relationship with Lyft. The City had knowledge of the plaintiff's expectancy because they specifically communicated Uber's accusations to Lyft. This was a purposeful interference by the City that prevented the Plaintiff's legitimate expectancy from ripening into a valid business relationship. Finally, Plaintiff suffered damages resulting from such interference in that not only was she unable to continue working for Lyft she but is now banned from working for all other TNPs due to her suspended TNP license. Just the act of allowing TNPs to immediately suspend TNP drivers' licenses without due process itself causes tortious interference, let alone communicating unverified allegations which cause other TNPs to deactivate drivers from their platforms.

    In the Memorandum in Support of their Motion to Dismiss, the City argues that Plaintiff could not have had a reasonable expectation of being able to drive for Lyft after Uber deactivated her because "[s]uch an expectation would not always be reasonable. For example, if Uber deactivated a driver after a hit-and-run ***conviction***, that driver would not have a reasonable expectation of working for another TNP licensee because he would no longer be eligible for a transportation network chauffeur license." DKT #32-1, p. 12, footnote 8 (emphasis added). The City's comparison is not analogous because Plaintiff was not *convicted* of anything. She was <u>accused</u> of spitting on a passenger without any evidence or the ability to present evidence to the contrary. If she was convicted of battery for spitting on a passenger that would change everything. The simple fact of the matter is that the Plaintiff was not convicted of any wrongdoing. Yet, without themselves investigating the matter, the City purposefully

12

communicated Uber's deactivation decision to Lyft (without evidence that Plaintiff actually conducted herself in a way "that gave rise to a public safety concern"), thereby interfering with Plaintiff's business expectancy with Lyft.

### B. The Illinois Tort Immunity Act does not bar Plaintiff's claim.

Absolute immunity for acts by nonjudicial government officers is determined on the basis of "a functional approach." *Wilson v. Kelkhoff*, 86 F.3d 1438, 1443 (7th Cir.1996). "Absolute immunity is only accorded for limited functions; `[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.'" Id. (quoting *Burns v. Reed*, 500 U.S. 478, 486–87, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)).

Under the doctrine of sovereign or governmental immunity, a governmental unit is immune from tort liability. *In re Chicago Flood Litigation*, 680 NE 2d 265, 271 (1997). An exception to governmental immunity is when a municipality performs a governmental function, the municipality is acting as the arm or agent of the state and, thus, is immune from liability for the torts committed by its officers and employees. *Id.* When the municipality performs a proprietary or corporate function, the municipality is liable for the tortious conduct of its officers and employees. *Id.* Whether a governmental function exists is determined from the nature of the duty to be discharged or the act to be done. *Id.* If the duty or act involves the general public benefit, rather than a corporate or business undertaking for the municipality's corporate benefit, then the function is governmental whether the duty be directly imposed on the municipality or is voluntarily assumed. *Merrill v. City of Wheaton*, 379 Ill. 504, 507–08, 41 N.E.2d 508 (1942); *Gebhardt v. Village of LaGrange Park*, 354 Ill. 234, 236, 238, 188 N.E. 372 (1933).

This court conceded long ago that the governmental/proprietary function distinction is vague and difficult to apply. It is not often easy to determine in a particular case whether the

activity is governmental or proprietary. *Roumbos v. City of Chicago*, 332 Ill. 70, 74-75, 163 N.E. 361 (1928).

Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 1994). The plain language of section 2-201 is unambiguous. That provision does not contain an immunity exception for willful and wanton misconduct. *In re Chicago Flood Litigation*, 680 NE 2d 265, 273 (1997).

Intentionally communicating unverified allegations from one private party to another without verification, which served to prevent the plaintiff's legitimate expectancy from ripening into a valid business relationship, was willful and wanton misconduct by the City. As such, the City is not immune under the Tort Immunity Act. Accordingly, Defendant's Motion to Dismiss must be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant City of Chicago's Motion to Dismiss in its entirety.

        Respectfully submitted,
        CERESA COHRAN

By:   /s/ Matthew R. Custardo
      One of her Attorneys

Matthew R. Custardo (ARDC #: 06329579)
CUSTARDO LAW, LLC
650 Warrenville Road, Suite 100
Lisle, IL 60532
Tel: 630-557-1451
matthew@custardolaw.com

**CERTIFICATE SERVICE**

      The undersigned attorney hereby certifies that on March 4, 2025, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, Chicago, Illinois, by using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this matter, as shown below:

*Andrew W. Worseck*
*Emily A. Vernon*
*CITY OF CHICAGO, DEPARTMENT OF LAW*
*Constitutional and Commercial Litigation Division*
*30 North LaSalle Street, Suite 1230*
*Chicago, Illinois 60602*
*andrew.worseck@cityofchicago.org*
*emily.vernon@cityofchicago.org*
**Attorneys for the City of Chicago**

*Kathryn Montgomery Moran*
*James Hager*
*JACKSON LEWIS P.C.*
*150 North Michigan Ave., Suite 2500*
*Chicago, IL 60601*
*Kathryn.Moran@jacksonlewis.com*
*James.Hager@jacksonlewis.com*
**Attorneys for Lyft Inc.**

*Amy Y. Cho*
*SHOOK, HARDY & BACON L.L.P.*
*111 South Wacker Drive, Suite 4700*
*Chicago, IL 60606*
*acho@shb.com*
**Attorneys for Uber Technologies, Inc.**

                                                /s/ Matthew R. Custardo

Matthew R. Custardo (ARDC #: 06329579)
CUSTARDO LAW, LLC
650 Warrenville Road, Suite 100
Lisle, IL 60532
Tel: 630–557–1451
matthew@custardolaw.com