**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CERESA COHRAN, | |
| Plaintiff, | Case No. 24 C 11917 |
| v. | |
| CITY OF CHICAGO, | Hon. LaShonda A. Hunt |
| Defendant.[1] | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ceresa Cohran ("Cohran"), a rideshare driver, filed this civil rights action under 42 U.S.C. § 1983, alleging that Defendant City of Chicago (the "City") violated her due process and equal protection rights, and tortiously interfered with her prospective business relationship with a rideshare company under Illinois law. (*See* Compl. ¶¶ 39-56, 65-69, Dkt. 1). The City moves to dismiss Cohran's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Mot., Dkt. 32). For the reasons discussed below, the motion is granted in part and denied in part.

**BACKGROUND**

Cohran raises claims based on the City's promulgation and enforcement of its Transportation Network Providers Rules ("TNP Rules"), an ordinance governing rideshare companies and their drivers, and other related statutes.[2] The Court begins with a brief overview of Chicago's rideshare regulatory scheme followed by a discussion of the complaint allegations.

---

[1] Plaintiff also sued Uber Technologies, Inc. (Count III), and Lyft, Inc. (Counts V and VI), but she and those defendants previously stipulated to dismissals with prejudice. (Dkts. 42, 59). Therefore, only the City of Chicago remains as a defendant.

[2] *See* https://www.chicago.gov/content/dam/city/depts/dol/rulesandregs/TNPRulesAmendedeff81020.pdf

### MCC Chapter 9-115 and the TNP Rules

Municipal Code of Chicago ("MCC") Chapter 9-115 establishes a licensing and regulatory framework for the rideshare industry. These regulations require rideshare companies like Uber and Lyft to obtain a transportation network provider ("TNP") license to operate in the City. MCC § 9-115-020. Similarly, individual rideshare drivers must acquire a transportation network chauffeur license before a TNP licensee like Uber may engage them as a rideshare driver. *Id.* § 9-115-150. TNP licensees must apply for TNP chauffeur licenses on the driver's behalf, and in doing so, attest that the driver is eligible for a license under the MCC and state law. *Id.* § 9-115-150(b)(4). The TNP licensee-rideshare companies must also provide training, perform criminal background checks, and obtain applicants' driving records. *See id.* §§ 9-115-150(b)(1)(iv), (4).

Rideshare companies and their drivers are also subject to the City's TNP Rules. These Rules, as amended and effective on August 10, 2020, allow for the Commissioner (the "Commissioner") of the City's Department of Business Affairs and Consumer Protection (the "Department") to properly administer and enforce MCC Chapter 9-115. *See id.* § 9-115-250(c). The TNP Rules include provisions that require TNP licensees to have processes in place to notify the Department of drivers that have been "permanently deactivated from the TNP's platform for conduct that gave rise to a public safety concern," (TNP Rule 1.10), as well as provisions outlining when a driver's chauffeur license may be automatically suspended (TNP Rule 5.02) or revoked (TNP Rule 5.13). In sum, the TNP Rules along with Chapter 9-115 of the MCC govern rideshare companies and their drivers operating in Chicago.

### Complaint Allegations

Cohran began working part-time as a driver for Uber in 2017 and transitioned to full-time in early 2024. (Compl. ¶ 26). In order to drive for Uber, the company necessarily must have

2

acquired a transportation network chauffeur license for Cohran (the "Chauffeur License"). *See* MCC § 9-115-150.[3] Despite maintaining a star rating of 4.92 out of 5 on the Uber app, Cohran received notice from Uber on April 6, 2024, that it had deactivated her from driving for Uber. (Compl. ¶¶ 27-28). The next day, Cohran visited the Uber Greenlight Hub station in Chicago to seek clarification on her deactivation, but the Uber representatives did not provide her with any information. (*Id.* ¶ 29). Uber then, on April 10, 2024, informed Cohran via email that she was being investigated for a "safety incident," but did not provide her with any other details despite her multiple inquiries over several weeks. (*Id.* ¶¶ 30-31). Finally, on April 28, 2024, Uber informed Cohran that it deactivated her due to an allegation that she spit on a passenger on April 5, 2024. (*Id.* ¶ 32). Cohran denied the allegation and attempted to appeal Uber's decision internally, but Uber never responded to her appeal. (*Id.* ¶ 33). There is no process outlined in the MCC or the TNP Rules that allow a driver like Cohran to appeal a deactivation by a TNP.

Cohran then began driving for Lyft. (*Id.* ¶ 34). However, on May 14, 2024, Lyft emailed Cohran indicating that the company had deactivated her Lyft account. (*Id.* ¶ 34). Citing TNP Rule 1.10, Lyft stated the following:

> Hello Ceresa:
>
> Pursuant to the City of Chicago's Rule TNP 1.10, Lyft was notified that you had been deactivated by another Transportation Network Provider (TNP) due to conduct that gave rise to a public safety concern. As such, you are also deactivated from the Lyft platform.
>
> We do not have information about the underlying incident. If you would like more information about the reported incident, we recommend you follow up with the TNP that deactivated your account from their platform.

---

[3] It is uncontested at this point that Cohran had a valid transportation network chauffeur license while driving for Uber.

> If you have been reactivated by the other TNP and would like to be reactivated on the Lyft platform, please provide evidence (i.e., screenshots, written documentation, etc.) to our support team and we will review your reactivation eligibility.
>
> Only the TNPs are able to resolve your account deactivation. The BACP is unable to assist you with this issue.
>
> Regards,
>
> The Lyft Team

(Compl. ¶ 34). In short, Lyft told Cohran that it must deactivate her Lyft account because it was notified pursuant to TNP Rule 1.10 that she had engaged in conduct while driving for Uber that gave rise to a "public safety concern." (*See id.*).

Cohran alleges that Uber and/or the City must have disclosed to Lyft that she had been deactivated from Uber for a contested public safety concern, which led to Lyft deactivating her account despite having no details about the alleged incident. (*Id.* ¶¶ 35-36). Cohran also alleges that she was not afforded an opportunity to appeal or refute the allegations made against her before deactivation from both rideshare companies. (*Id.* ¶ 37). And as a result of these actions, she was unable to earn a living as a rideshare driver in Chicago. (*Id.* ¶ 38).

Cohran subsequently sued Uber, Lyft, and the City alleging: (1) the TNP Rules and related ordinances violated her right of procedural and substantive due process under the Fourteenth Amendment and 42 U.S.C. § 1983; (2) the TNP Rules and related ordinances violated her right to equal protection under the Fourteenth Amendment and 42 U.S.C. § 1983; and (3) the City tortiously interfered with a prospective economic advantage by reporting the contested safety incident to Lyft which interfered with Cohran's prospective business relationship with the company. (Compl. ¶¶ 39-56, 65-69). The City, the sole remaining defendant, seeks to dismiss the complaint (Counts I, II, and IV) for failure to state a claim.

**LEGAL STANDARD**

Rule 12(b)(6) provides that a complaint may be dismissed if it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). For purposes of analyzing a motion to dismiss, facts that are well-pled must be accepted by the court as true, and all reasonable inferences must be drawn in the plaintiff's favor. *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021). However, the court need not accept legal conclusions as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). And a claim must be facially plausible to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**DISCUSSION**

Cohran brings three counts (which the Court construes as four claims) against the City, for violations of her procedural and substantive due process rights (Count I) and equal protection (Count II), and a state law claim of tortious interference with her prospective business relationship with Lyft (Count IV). The City contends for several reasons that Cohran has not plausibly alleged a claim. For the most part, the Court agrees that Cohran's complaint falls short, except with respect to her procedural due process claim.

**I.     Procedural Due Process (Count I)**

The Fourteenth Amendment protects against the deprivation of a protected liberty interest without due process of law. U.S. Const. amend. XIV. "To demonstrate a procedural due process violation of a property right, the plaintiff must establish that there is '(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process.'" *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) (quoting *Hudson v. City of Chi.*, 374 F.3d 554, 559 (7th Cir.

2004)). Cohran argues that she has a protected property interest in her Chauffeur License. (Resp. Mot., at 137, Dkt. 41).[4] And the City's enforcement of the TNP Rules deprived her from that protected interest. (*Id.* at 135). The Court concludes that this claim can go forward.

### A.     Property Interest

Cohran must first establish a constitutionally protected interest to properly state a claim. *See Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 694 (7th Cir. 2013) ("The threshold question in any due process challenge is whether a protected property or liberty interest actually exists."). Cohran contends that the TNP Rules provide her with a protected "property interest" in her Chauffeur License which she was deprived of without a hearing due to the City's rules. (Resp. Mot., at 137). The City counters that Cohran does not have any legitimate claim of entitlement to a transportation network chauffeur license because the interest is contingent on her "remaining 'in good standing with . . . the affiliated TNP licensee's platform . . . .'" (Reply, at 294, Dkt. 51). The Court disagrees with the City.

Property interests "are not created by the Constitution" but by "existing rules or understandings that stem from an independent source such as state law . . . ." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). In *Bd. of Regents v. Roth*, the Supreme Court made plain that to have a "property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* (finding no protected property interest where state university declined to renew one-year fixed-term employment contract). It follows that a "legitimate claim of entitlement" is "one that is legally enforceable—one based on statutes or

---

[4] Page numbers in citations refer to the "PageID" in the CM/ECF header, not "Page __ of __" in the CM/ECF header or any page number appearing in the footer.

regulations containing explicitly mandatory language that links specified substantive predicates to prescribed outcomes." *Miller v. Crystal Lake Park Dist.*, 47 F.3d 865, 867 (7th Cir. 1995) (quotes omitted).

For a statute or regulation to create a property interest, it "must contain specific directives to the decision maker such that if the regulation's 'substantive predicates' are met, a particular outcome necessarily follows." *Kim Constr. Co. Inc. v. Bd. of Trs. of Vill. of Mundelein*, 14 F.3d 1243, 1247 (7th Cir. 1994). "[W]here state law gives people a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement." *Chicago United Indus., Ltd. v. City of Chicago*, 669 F.3d 847, 851 (7th Cir. 2012); *see also Khan*, 630 F.3d at 527 ("A property interest of constitutional magnitude exists only when the state's discretion is 'clearly limited' such that the plaintiff cannot be denied the interest 'unless specific conditions are met.'"). Importantly, "property is what is securely and durably yours under state . . . law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Kim Constr. Co.,* 14 F.3d at 1246 (quoting *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983), overruled on other grounds by *Brunson v. Murray*, 843 F.3d 698 (7th Cir. 2016)).

For example, in *Reed*, a case cited by Cohran in support of her argument, the Seventh Circuit found that the plaintiffs had a property interest in the renewal of their liquor license. 704 F.2d at 948-949. There, the relevant state law provided that a liquor license "is good for one year and during that time . . . it can be revoked only for cause, after notice and hearing, subject to judicial review." *Id.* at 948. It also provided that "any licensee may renew his license at the expiration thereof, provided he is then qualified to receive a license and the premises for which such renewal license is sought are suitable for such purposes." *Id. Reed* reasoned that a property

interest existed in the liquor license because the "criteria for renewal are undemanding, which suggests that the Illinois legislature expected most licenses to be renewed as a matter of course." *Id.* at 948-949. This expectation of renewal created a property interest in that license which is entitled to due process protection. *Id.* at 949; *see also Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989) ("[T]he use of 'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' to limit discretion, forces a conclusion that the State has created a liberty interest."); *Kim Constr. Co.*, 14 F.3d at 1247-1248 (holding that *Thompson*'s principles apply to property interests).

Conversely, the City points to *Bayview-Lofberg's, Inc. v. Milwaukee*, 905 F.2d 142 (7th Cir. 1990), in support of its argument that Cohran had no claim of entitlement to her Chauffeur License. (*See* Reply, at 294). In that case, the plaintiffs both filed for liquor licenses which were denied because of an overconcentration of liquor-selling establishments near the plaintiff-stores. *Bayview*, 905 F.2d at 143. The plaintiffs then sued the defendant-city for violations of their due process rights asserting that the local ordinances entitled them to liquor licenses after completion of procedural requirements and the defendant had no discretion to deny their applications. *Id.* After the district court dismissed the plaintiffs' complaint for failure to state a claim, the plaintiffs appealed and the Seventh Circuit affirmed. *Id.* at 146. The court reasoned that because the local ordinances listed factors to which the decisionmakers "*may* consider at the hearing," including the "*appropriateness* of the location," "[w]hether the location will create *undesirable* neighborhood problems," "[w]hether there is an *overconcentration* of licensed establishments in the neighborhood," and "[a]ny other factors which reasonable relate to the public health, safety and welfare," the plaintiffs had no property interest in a liquor license. *Id.* at 145-146 (emphasis in original). Specifically, the court stated that "the ordinance does not establish substantive criteria

8

which, if met, automatically entitle an applicant to a liquor license." *Id.* at 145. Further, the specific language in the ordinance, including "[t]he words 'appropriateness,' 'undesirable,' and 'overconcentration,' as well as the general welfare clause, persuaded the Seventh Circuit that there was "discretion vested in the [decisionmakers] regarding the nature of the decision to be made in evaluating an application . . . ." *Id.* at 146; *see also Eidson v. Pierce*, 745 F.2d 453, 462 (7th Cir. 1984) (finding no constitutionally protected property interest where interest is based on "discretionary judgments which, in some respects, are not constrained by any legal criteria"); *Long Grove Country Club Estates, Inc. v. Long Grove*, 693 F. Supp. 640, 655 (N.D. Ill. 1988) ("The relevant Illinois statutes do not entitle plaintiffs to a culvert permit; these statutes do not substantively restrict IDOT's discretion.").

Like *Reed* and *Bayview*, determining whether Cohran has a property interest requires the Court to analyze the TNP Rules and the MCC, *i.e.*, the independent sources that purportedly establish Cohran's property interest in her Chauffeur License. The TNP Rules dictate that a TNP must engage a person as a driver only if they "possess[] a valid transportation network chauffeur license," pursuant to MCC § 9-115-150. TNP Rule 1.06(a). In addition, these rules dictate that a TNP licensee must acquire a chauffeur license "for their affiliated transportation network drivers," and that "no driver shall operate a transportation network vehicle," without such a license. TNP Rule 1.06(a)-(b).

Regarding the issuance or renewal of a chauffeur license, MCC § 9-115-150(b)(1) outlines that "[a]n applicant is qualified for the issuance or renewal of a transportation network chauffeur license, if the applicant" meets twelve substantive criteria establishing: their eligibility to drive a motor vehicle; an adequate driving record; completion of City-operated training programs; an adequate criminal history; adequate prior conduct while using their chauffeur license; and

9

compliance with other regulations. MCC §§ 9-115-150(b)(1)(i)-(xii).[5] If all requirements are met, the "[TNP] licensee shall submit to the Commissioner the name of each applicant eligible for the issuance or renewal of a transportation network chauffeur license, attesting . . . that each such applicant meets all the requirements of subsection (b)," along with a background check of the driver. MCC § 9-115-150(b)(4). Once submitted, "the Commissioner shall issue a transportation network chauffeur license . . . for a maximum of a one-year period." MCC § 9-115-150(b)(5).

In addition, the TNP Rules include provisions regarding the suspension and revocation of a chauffeur license. With regard to suspension, the TNP Rules affirmatively state that "as long as the affiliated transportation network driver issued the TNP chauffeur license is affiliated, active, and is in good standing with the City of Chicago and the affiliated TNP licensee's platform," their "chauffeur license is valid." TNP Rule 5.02. However, "[d]eactivation from a licensed TNP platform immediately suspends the transportation network driver's TNP chauffeur license." *Id.* The TNP Rules further offer seven reasons why a chauffeur license could be revoked, including failure to comply with legal processes, violation of the law, ineligibility, and types of fraud or dishonesty. TNP Rule 5.13(a). The Court reads this provision as providing an exclusive list of reasons for which a chauffeur license may be revoked. *See Chi. United Indus. v. City of Chi.*, 685 F. Supp. 2d 791, 809 (N.D. Ill. 2010) (citing *City of St. Charles v. Illinois Labor Relations Bd.,*

---

[5] These criteria include the applicant holding a valid U.S. driver's license for at least one year with no current suspensions or revocations and be at least 21 years old. MCC §§ 9-115-150(b)(1)(i)-(ii). The applicant cannot have recent convictions for reckless driving, hit and run, evading police, driving with a suspended license, or more than one moving violation within the past 12 months, nor any license cancellations, suspensions, or revocations due to driving incidents in the past year. MCC §§ 9-115-150(b)(1)(iii), (ix). All applicants must complete a Commissioner-approved training program. MCC § 9-115-150(b)(1)(iv). The driver cannot have been convicted, incarcerated, on parole, or under supervision for specified offenses within three years, cannot be a registered sex offender or violent offender against youth, have a lifetime parole sentence, or have an outstanding warrant, and cannot have been convicted of or released from incarceration for non-forcible felonies, identity theft, forgery, counterfeiting, or theft over $1,000 within one year. MCC §§ 9-115-150(b)(1)(v)-(vii). Finally, the applicant's licensing history must show no denied or rescinded chauffeur applications within one year, no City chauffeur license revocations within three years, and no ineligibility designations under applicable law or by the Commissioner. MCC §§ 9-115-150(b)(1)(viii), (x)-(xii).

916 N.E.2d 881, 884 (Ill. App. Ct. 2009) (under the maxim of construction *inclusio unius est exclusio alterius,* "where a statute [or administrative regulation] lists the thing or things to which it refers, the inference is that all omissions are exclusions, even in the absence of limiting language")). If any of these reasons exist, the "Commissioner shall institute an action with the Department of Administrative Hearings," where the license holder will have a hearing in front of an administrative law officer to determine whether to issue a sanction such as revocation. TNP Rule 5.13(b).

Based on the above, the Court finds that Cohran had a constitutionally protected interest in her Chauffeur License. Unlike in *Bayview*,[6] the process to issue or renew a chauffeur license does not include any discretionary language that requires the Commissioner to assess circumstances such as the appropriateness and desirability of a location, whether there is an overconcentration of similar licenses, or the general welfare of the community. Similar to *Reed,* if the MCC's twelve enumerated substantive predicates are met, a particular outcome necessarily follows as relevant statutes state that "the Commissioner *shall* issue a transportation network chauffeur license," for any "eligible" applicant. MCC § 9-115-150(b)(5) (emphasis added); *see also FDIC v. Chi. Title Ins. Co.*, 12 F.4th 676, 683 (7th Cir. 2021) (finding that a "shall" instruction generally is a mandatory instruction, as in "a court shall include something"). In addition, the TNP Rules indicate

---

[6] Similar to its reliance upon *Bayview*, the City also cites *Makhsous v. Daye*, 980 F.3d 1181 (7th Cir. 2020) in support of its argument that Cohran had no claim of entitlement to her Chauffeur License. (*See* Mem. Supp. Mot., at 90, Dkt. 32-1). That case involved a plaintiff who owned three residential care facilities and filed suit contending that the defendant violated her due process rights by refusing to refer individuals to her facilities. *Makhsous*, 980 F.3d at 1183. The Seventh Circuit affirmed the district court's grant of summary judgment because the two purported sources of the plaintiff's property right were a statute that merely provided for the creation and operation of certain resource centers but did not confer any property right, and a contract to which plaintiff was not a party. *Id.* The court found that without more, the plaintiff's desire for individuals to be referred to her facilities was "a mere unilateral expectation and insufficient to support a due process claim." *Id.* (quotes omitted). Put differently, the statute and contract in *Makhsous* were inapplicable to the plaintiff and therefore could not have supported any property right. As such, the case is not helpful since the TNP Rules and MCC applied to Cohran and provided her with property, *i.e.,* the Chauffeur License. The question presented here is whether her property interest in the Chauffeur License rises to one that is constitutionally protected—which the Court finds it does.

11

that a TNP chauffeur license can be revoked only for cause after notice and hearing. TNP Rule 5.13(b). Based on this statutory scheme, Cohran has a vested interest in her Chauffeur License because the City's discretion with respect to issuing or renewing her license is limited such that she cannot be denied the license where specific conditions are met.

### B.    Deprivation of Protected Property Interest

Next, the City maintains that even if Cohran could allege a protected property interest, her claim still fails "because the city did not deprive her of any interest," Uber and Lyft did. (Mem. Supp. Mot., at 91). Cohran counters that "[e]ven though the City itself never revoked Plaintiff's TNP license, it allowed baseless allegations by Uber to form the basis of the immediate suspension of her TNP license without a hearing." (Resp. Mot., at 137). The Court concludes that the suspension of Cohran's Chauffeur License amounts to a deprivation of her property interest.

The Seventh Circuit recognized in *Reed* that, under certain circumstances, a functional revocation of a license can constitute a deprivation of the licensee's property rights. In *Reed,* the holders of a liquor license were harassed by village police and subjected to numerous groundless proceedings in an attempt by village officials to take away the liquor license. 704 F.2d at 947-948. Although the village's attempts to formally revoke the license failed, the continued harassment eventually caused the licensees to close their business and surrender their license. *Id.* at 947. After the district court dismissed the licensees' due process claim, the Seventh Circuit reversed, holding that an individual can be "deprived of their property right in [a] license even though the license was never actually revoked" if government actions "destroyed the value of the plaintiffs' licensed business and forced them ultimately to give up their . . . license." *Id.* at 949. In addition, the Supreme Court has recognized that a suspension of property rights can also amount to an unconstitutional deprivation. *Goss v. Lopez*, 419 U.S. 565, 576, 584 (1975) (student suspended for

12

ten days from public school); *Barry v. Barchi*, 443 U.S. 55 (1979) (horse trainer's license suspended for 15 days); *Mackey v. Montrym*, 443 U.S. 1 (1979) (90-day suspension of driver's license). Because the City's rules automatically suspended Cohran's Chauffeur License upon deactivation from Uber, she was deprived of her property interest in the license.

The Court's inquiry does not stop there, however, because the City disputes that the private actions of Uber and Lyft amount to a constitutionally recognized deprivation *by the City*. Cohran's argument, *i.e.*, the City's rules mandate suspension of her license upon an allegation of a public safety concern, amounts to an argument for the "state compulsion" theory of state action.

Under the "state compulsion" test, a 42 U.S.C. § 1983 claim may be stated "when the state has so implicated itself in the [private actor]'s action that the state has in effect compelled the action." *Starnes v. Capital Cities Media, Inc*, 39 F.3d 1394, 1396 (7th Cir. 1994). This test originated in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 170 (1970). There the Supreme Court held that a "state is responsible for the [unconstitutional] act of a private party when the state, by its law, has compelled the act. . . . When the State has commanded a particular result, it has saved to itself the power to determine that result and thereby to a significant extent has become involved in it." *Id.* (citation and quotes omitted). However, the command has to involve action under color of some "statute, ordinance, regulation, custom, or usage, of a[] State," in the language of § 1983 itself. *Id.* at 150. As such, in order to satisfy the "state compulsion" test, Cohran must show that the City "has exercised coercive power or provided such significant encouragement, overt or covert, that the choice in law must be deemed to be that of the [City]." *Blum v. Yaretsky,* 457 U.S. 991, 1004 (1982).

For the City to be held liable for a constitutional violation, the violation must have resulted from a formal policy, an informal custom, or a decision "made by its lawmakers or by those whose

edicts or acts may fairly be said to represent official policy." *Bradley v. Vill. of Univ. Park*, 929 F.3d 875, 879 (7th Cir. 2019) (quoting *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691, 694 n.58 (1978)). In this case, Cohran alleges that "TNP [Rule] 1.10 and related ordinances effectively bar Plaintiff from working as a rideshare driver," by "mandat[ing] deactivation by other [TNPs] if a driver is deactivated [by another TNP] for a public safety concern." (Compl. ¶¶ 34, 39). TNP Rule 1.10 states that TNPs like Uber and Lyft "must have in places a process to notify and report to the Department . . . [the information] of an affiliated transportation network driver permanently deactivated from the TNP's platform for conduct that gave rise to a public safety concern," which includes criminal arrests and investigation, sexual misconduct, account sharing, and a catch-all provision requiring deactivation for "[c]onduct that gave rise to a public safety concern not itemized above in this section." TNP Rule 1.10(a). The TNP must then "notify the Department within four business days of deactivating a driver for the reasons specified in this Rule," which "immediately suspends the transportation network driver's TNP chauffeur license." *Id.* at 1.10(b), 5.02. In other words, these provisions create a statutory regime that functionally revokes a driver's chauffeur license without a hearing because it requires deactivation and indefinite suspension of a driver's TNP chauffeur license based solely on an allegation that the driver has engaged in conduct that raises general concerns of public safety.

Moreover, for the carrot of allowing TNPs to continue to hold their license to operate in the Chicago market, the City also holds the stick of fines, suspension, or outright revocation of the TNPs license for failure to comply with its rules. Section 9-115-150(a)(1) of the MCC mandates that "[n]o transportation network provider licensee shall engage any person as a transportation network driver unless the person possesses a valid transportation network chauffeur license." And subsection (f) instructs that "[i]f any licensee engages an ineligible driver, the licensee shall be

liable for the violation of this section." MCC § 9-115-150(f). Therefore, if a TNP licensee allows a suspended driver to continue to drive—whether that particular TNP or another suspended the driver—in violation of those rules, the MCC imposes a fine on the TNP of "not less than $500 and not more than $10,000" for each day the violation continues and allows the Commissioner to "seek all applicable penalties, including . . . license suspension, and license revocation." MCC §§ 9-115-220(a), 9-115-230(a). A logical reading of these provisions is that these penalties create a classic "Catch-22," where TNPs must take action and suspend a driver's chauffeur license without recourse or subject themselves to steep consequences.[7]

Viewing the complaint allegations in the light most favorable to Cohran, as the Court must at this stage of the case, Cohran has adequately pled that Uber deactivated her account due to the City's rules. Furthermore, Cohran has also sufficiently pled that after Lyft was notified pursuant to TNP Rule 1.10 that she had been deactivated by Uber "due to conduct that gave rise to a public safety concern," she was deactivated from Lyft as well, even though Lyft, in its own words, "d[id] not have information about the underlying incident." (Compl. ¶ 34). Put differently, Cohran has pled that Lyft felt compelled by the City's ordinances to deactivate her account after a contested public safety concern because Uber's deactivation suspended, and functionally revoked, her Chauffeur License even though neither entity had provided her with a hearing before taking those actions.

Accordingly, because Cohran plausibly alleges that the City's ordinances do not leave the decision of whether or not to deactivate an account (which immediately suspends a chauffeur

---

[7] The City's contention that Cohran could have worked for another TNP after the Uber deactivation is a nonstarter. Assuming that Uber and Lyft are the only TNP licensees in Chicago, as the complaint alleges, Cohran says that she was able to begin driving for Lyft after Uber deactivated her (presumably under a chauffeur license that Lyft obtained on her behalf), but then Lyft deactivated her too, citing Uber's actions, which would have caused another immediate suspension of her chauffeur license.

license) to the TNPs' discretion, "but instead compels certain action by threatening [sanctions], the choice 'must be deemed that of the state.'" *Mayers v. N.Y. Cmty. Bancorp, Inc.*, No. CV-03-5837 (CPS), 2005 WL 2105810, at *9 (E.D.N.Y. Aug. 31, 2005) (quoting *Blum,* 457 U.S. at 1004) (finding that where a statute compelled a bank to freeze accounts "irrespective of their contents" or risk being held in "contempt of court," to be a state compulsion). In other words, the complaint states a claim that the City has so implicated itself in the deactivation decisions of TNPs like Uber and Lyft that their choices to deactivate Cohran can be deemed that of the City.

### C. Sufficiency of Procedural Protections

Finally, the Court must evaluate whether the procedural protections the City has in place to protect drivers like Cohran pass constitutional muster. "Not every deprivation of property requires the full arsenal of available procedural safeguards." *Clancy v. Office of Foreign Assets Control*, 559 F.3d 595, 600 (7th Cir. 2009). The question is not whether additional procedures would be helpful, but whether "the existing procedures are constitutionally defective because they present an unreasonable risk of an erroneous deprivation of the private interest, in light of the particular situation." *Id*. A claim based on a deprivation from established state procedures requires more than just the availability of post-deprivation procedures. *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010). "The state's ability to predict when a deprivation will occur provides the state the ability to provide a pre-deprivation hearing." *Cannici v. Vill. of Melrose Park*, 885 F.3d 476, 479 (7th Cir. 2018).

"Moreover, 'the requirement of due process, including a pre-deprivation hearing where feasible, applies to temporary as well as to permanent deprivations.'" *Siebert v. Severino*, 256 F.3d 648, 659 (7th Cir. 2001) (quoting *Penn Cent. Corp. v. U.S. R.R. Vest Corp.,* 955 F.2d 1158, 1162 (7th Cir. 1992)). "The purpose of a pre-termination hearing is to provide 'an initial check against

mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the [holder of the property interest] are true and support the proposed action.'" *Carmody v. Bd. of Trs. of the Univ. of Ill.*, 747 F.3d 470, 475 (7th Cir. 2014) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-546 (1985)). Simply stated, "once an individual or group has made a decision to take a particular course of action, it becomes harder and harder to change course, even in the face of powerful conflicting evidence and reasons." *Id.* Thus, "[a]bsent exigent circumstances, or a random or unforeseen act, a pre-deprivation procedure is generally required before the government may deprive a person of their property." *Siebert*, 256 F.3d at 659.

The City does not argue that the acts which led to it suspending Cohran's Chauffeur License were random, unforeseen, or exigent as to have justified dispensation of the pre-deprivation hearing. (*See* Mem. Supp. Mot, at 91) (stating that the alleged misconduct is due to private actions by Uber and Lyft, not the City). Therefore, a pre-deprivation hearing was seemingly required. Yet, even in the absence of those "enumerated discrete exceptions to the requirement of pre-deprivation process," *Penn Cent.*, 955 F.2d at 1164, under *Mathews v. Eldridge*, 424 U.S. 319, (1976), the Court still must ponder "whether, all things considered, predeprivation process is a reasonable requirement to impose. That depends on the balance between the benefits and the costs of such process." *Penn Cent.*, 955 F.2d at 1163. The three relevant considerations are: (1) the private interest that will be affected, (2) the risk of an erroneous deprivation, and (3) the government interest. *See Mathews*, 424 U.S. at 335.

First, "[g]overnment-issued licenses to perform certain types of work that allow the license holders to earn their livelihoods are a form of government-created property—an entitlement—and have long been considered property protected by the Fifth and Fourteenth Amendments." *Simpson*

17

*v. Brown Cnty.*, 860 F.3d 1001, 1006 (7th Cir. 2017); *see also Barry*, 443 U.S. at 64 ("[I]t is clear that [plaintiff] had a property interest in his license [as a harness-racing trainer] sufficient to invoke the protection of the Due Process Clause."). "The Supreme Court has 'frequently recognized the severity of depriving a person of the means of livelihood.'" *Simpson*, 860 F.3d at 1008 (quoting *Loudermill*, 470 U.S. at 543). Therefore, it is clear that Cohran has a substantial interest in her Chauffeur License which is a form of government-created property that allows her to make a living.

Second, the risk of an erroneous deprivation here is present. The City's rules provide a pre-deprivation process for the *revocation* of a TNP chauffeur license for a driver's failure to comply with legal processes, violation of the law, ineligibility, and types of fraud or dishonesty, *see* TNP Rule 5.13, but provide no such process for the deactivation and indefinite suspension of a TNP chauffeur license. This lack of process creates a loophole where TNPs must deactivate drivers for "public safety concern[s]" pursuant to TNP Rule 1.10(a), which triggers TNP Rule 5.02 thereby immediately suspending a driver's TNP chauffeur license indefinitely without a hearing. In this case, the current procedure allowed someone to accuse Cohran of engaging in conduct that raised a public safety concern without affording any opportunity for the driver to challenge the complaint before the suspension of her chauffeur license. Providing some sort of pre-deprivation hearing could prevent or reduce the chance of erroneous deprivation based on misrepresentations by passengers or other third parties. The Court sees "no reason to believe that the cost of basic procedures (*e.g.*, meaningful notice and an informal hearing) would be unduly burdensome in comparison with the protections those additional procedures would provide." *Simpson*, 860 F.3d at 1008 (citing *Mackey v. Montrym*, 443 U.S. 1, 21 (1979) ("When a deprivation is irreversible— as is the case with a license suspension that can at best be shortened but cannot be undone—the

requirement of some kind of hearing before a final deprivation takes effect is all the more important.")).

Finally, the City argues that it has a "legitimate interest in promoting rider safety." (Mem. Supp. Mot., at 93). However, this interest does not necessarily override Cohran's right to be heard. For example, in *Siebert*, the Seventh Circuit found that the plaintiff had presented enough facts to support a due process claim based on the removal of her horses without a pre-deprivation hearing. 256 F.3d at 660. In that case, the defendants waited 72 hours after providing notice before seizing the plaintiff's horses, which demonstrated the feasibility and the lack of a burden in non-exigent circumstances of the government providing a pre-deprivation process. *Id.* The Seventh Circuit found that a "full-blown hearing" may not be required, "but at a minimum [the plaintiff] had the right to some sort of pre-deprivation opportunity to be heard" before the government took her property. *Id.*

Here, Cohran alleges that she never received a hearing after Uber deactivated her account on April 6, 2024, thereby immediately suspending her Chauffeur License pursuant to the City's TNP Rule 5.02. (*See* Compl. ¶¶ 28-38). It took Uber over three weeks to inform Cohran that the deactivation and indefinite suspension of her Chauffeur License occurred because a passenger alleged that Cohran spit on her on April 5, 2024. (*Id.* ¶ 38). As a result, Lyft also felt compelled to deactivate Cohran from its own platform on May 14, 2024, rather than risk repercussions from the City due to the allowance of a suspended driver on its platform. (*See id.* ¶ 34). Like the plaintiff in *Siebert*, Cohran received no hearing regarding either deactivation from the TNP platforms or the related suspension of her Chauffeur License.

The City has not argued that it would be burdened by a pre-deprivation hearing or that suspending Cohran's Chauffeur License required exigent action. "Where predeprivation

procedures are both required and practicable, municipal policymakers expose the municipality and themselves to liability under § 1983 if they deliberately disregard an individual's constitutional due process rights." *Houston v. City of Chi.*, No. 20 CV 06720, 2024 WL 278999, at *5 (N.D. Ill. Jan. 25, 2024) (quoting *Bradley*, 929 F.3d at 879). Accordingly, "[u]nder the circumstances [Cohran] alleges here, [the Court] see[s] no obvious reason why the [City] could not have provided advance notice and a pre-deprivation hearing before it" allowed Cohran's Chauffeur License to be suspended and functionally revoked. *Luster v. Vill. of Ashmore*, 76 F.4th 535, 537 (7th Cir. 2023). The Court therefore finds that Cohran has plausibly alleged a procedural due process claim based on the suspension of her Chauffeur License.

## II.    <u>Substantive Due Process (Count I)</u>

Besides its procedural component, "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The danger of governmental arbitrariness is gravest, and judicial scrutiny sharpest, in the field of "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21, (1997) (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plur.)); *see also Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024) ("When a fundamental right is at stake, the Government can act only by narrowly tailored means that serve a compelling state interest."). If a plaintiff cannot identify a fundamental right, the government must provide only a rational basis for its actions. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) (finding that smoking is not a fundamental right and therefore, rational basis review is the appropriate level of scrutiny to

20

analyze a smoking ban ordinance). Moreover, the scope of substantive due process is "very limited." *Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007); *see also Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003) ("[S]ubstantive due process is not 'a blanket protection against unjustifiable interferences with property.'") (citation omitted).

Cohran's substantive due process claim is premised on the City unconstitutionally preventing her from "earning a living" as a rideshare driver via the TNP. (Compl. ¶ 47). However, Cohran's claim fails because "employment-related rights are not fundamental." *Price v. City of Chi.*, No. 25 C 00791, 2025 WL 1755452, at *4 (N.D. Ill. June 25, 2025) (citing *Campos v. Cook Cnty.*, 932 F.3d 972, 975 (7th Cir. 2019)). "Because the right to employment is not fundamental, rational basis review applies. Rule TNP 1.10 easily survives rational basis review." *Id.* Under rational basis review, a state law is constitutional even if it is "unwise, improvident, or out of harmony with a particular school of thought." *Goodpaster*, 736 F.3d at 1071 (citations omitted). The law only must "bear[] a rational relationship to some legitimate end." *Id.* "Rule TNP 1.10 arguably helps ensure that the City can maintain a record of drivers whose ride share accounts have been deactivated due to various reasons, including public safety violations." *Price*, 2025 WL 1755452, at *4. Accordingly, the rule bears a rational relationship to maintaining public safety on roads—which the Court finds is a "legitimate end." *Goodpaster*, 736 F.3d at 1071. Cohran's substantive due process claim cannot proceed.

### III.     <u>Equal Protection (Count II)</u>

Cohran argues that the City violated her Fourteenth Amendment right to equal protection of the law. (Resp. Mot., at 138). Cohran bases this claim on the so-called "class of one" equal protection theory, asserting that she has been treated differently from taxi drivers who are similarly situated to TNP drivers like herself. (*Id.* at 138-139). The City notes that the Seventh Circuit has

already determined that TNP drivers and taxi drivers are not similarly situated for equal protection purposes, so Cohran's claim must fail. (Reply, at 297) (citing *Ill. Transp. Trade Assn v. City of Chi.*, 839 F.3d 594, 598 (7th Cir. 2016)). The Court agrees.

To begin, the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The City's TNP regime does not "draw lines based on race or any other suspect classification, it doesn't burden a fundamental right, and it raises no federalism concerns under the . . . dormant commerce-clause doctrine. So [Cohran]'s equal-protection challenge triggers only the most lenient form of judicial review: the law is valid unless it lacks a rational basis." *Monarch Bev. Co. v. Cook*, 861 F.3d 678, 681 (7th Cir. 2017) (citing *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 107 (2003); *Indiana Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015)). "This deferential standard of review is a notoriously 'heavy legal lift for the challenger[].'" *Id.* (quoting *Indiana Petroleum*, 808 F.3d at 322).

To allege a "class of one" claim, a plaintiff must show (1) that they were intentionally treated differently from others similarly situated, and (2) that there was no rational basis for that differential treatment, or that the differential treatment was the result of an illegitimate animus toward the plaintiffs by the defendants. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000); *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001-02 (7th Cir. 2004); *see also Engquist v. Or. Dep't of Agric.*, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008) (holding that class-of-one theory does not apply to public employment cases). Because Cohran cannot satisfy the first element, her claim fails.

Indeed, the Seventh Circuit instructs that taxi drivers and TNP drivers are not similarly situated. In *Ill. Transp. Trade Assn v. City of Chi.*, the district court's ruling on the defendant's

motion to dismiss found that "by failing to place as many regulatory burdens on the TNPs as on the taxicab companies, [Chicago] might have denied the latter the equal protection of the law." 839 F.3d at 598. On appeal, the Seventh Circuit reversed that ruling, reasoning that the two groups are not similarly situated for purposes of equal protection because "[t]here are enough differences between taxi service and TNP service to justify different regulatory schemes, and the existence of such justification dissolves the plaintiffs' equal protection claim." *Id.* Because that authority is binding, Cohran's equal protection claim must be dismissed.

## IV.   Tortious Interference (Count IV)

Cohran alleges that the City engaged in tortious interference by allegedly "reporting an unverified 'public safety concern' concerning Plaintiff to Lyft.'" (Compl. ¶ 68). The City maintains that the Illinois Tort Immunity Act ("Act") bars Cohran's claim. (Mem. Supp. Mot., at 97). Specifically, the City argues that the Act: (1) "immunizes the City from liability for 'adopting or failing to adopt' Plaintiff's preferred regulatory scheme," under 745 ILCS 10/2-103; and (2) "immunizes the City from liability for sharing information" under 745 ILCS 10/2-107. (Reply, at 298-299). Cohran responds that the Act does not bar her claim because the City's misconduct here was willful and wanton. (Resp. Mot., at 143). The Court finds the City's argument more persuasive.

Under the Act, "Illinois adopted the general principle that local governmental units are liable in tort, but limited this liability with an extensive list of immunities based on specific government functions." *Vill. of Bloomingdale, Inc.*, 752 N.E.2d at 1095 (citations omitted). Section 2-103 of the Act provides that a local government entity is immune from "injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." 745 ILCS 10/2-103. Despite Cohran's argument, there is no exception in the provision for willful and wanton conduct.

Moreover, Illinois law holds that the willful and wanton conduct exception cannot be read to limit 2-103's absolute immunity for public entities. *See Anthony v. City of Chi.*, 888 N.E.2d 721, 730 (Ill. App. Ct. 2008); *see also Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 921 (7th Cir. 2015) ("There is no willful and wanton exception for provisions of the Act that do not expressly contain such an exception.").

Nonetheless, under the provision, a local public entity is not liable for an injury caused by adopting a regulation. *See* 745 ILCS 10/2-103; *see also* 745 ILCS 10/1-203 (including "regulation" within definition of "enactment"). "Regulation," in turn, "means a rule, regulation, order or standard, having the force of law, adopted by an employee or agency of . . . a local public entity pursuant to authority vested by constitution, statute or ordinance in such employee or agency to implement, interpret, or make specific the law enforced or administered by the employee or agency." 745 ILCS 10/1-208. The TNP Rules were issued under the authority granted by the MCC to the Commissioner of the Department pursuant to Chapter 2-25—the Department's enabling statute—and Chapter 9-115, which gives the Commissioner authority "to adopt rules and regulations for the proper administration and enforcement of this chapter." MCC § 9-115-250(c). The TNP Rules are regulations with the force of law, adopted by a local public entity pursuant to an authority vested in it by statute, so Section 2-103 of the Act protects the City from damages for liability arising out of their adoption. *See Schneider v. City of Chi.*, No. 22 CV 1031, 2023 WL 8019434, at *4 (N.D. Ill. Nov. 20, 2023) (finding that the plaintiffs' claim for damages arising out of harm caused by a regulation of the City of Chicago was barred by Section 2-103 of the Act). Cohran makes no argument otherwise; consequently, this claim must be dismissed.[8]

---

[8] Because the Court finds that 745 ILCS 10/2-103 applies, it is not necessary to decide if immunity is granted under 745 ILCS 10/2-107.

## CONCLUSION

For all the foregoing reasons, Defendant City of Chicago's motion to dismiss Plaintiff Ceresa Cohran's complaint is granted in part and denied in part. Count I (substantive due process), Count II (equal protection) and Count IV (tortious interference) are dismissed; Count I (procedural due process) may proceed.

**DATED**: January 29, 2026

**ENTERED**:

LaShonda A. Hunt
United States District Judge